PLAGER, Circuit Judge,
dissenting.
I respectfully dissent from the majority’s conclusion that, as a matter of law, Ms. Graviss was denied her constitutional rights during her removal from federal service. Not only does the majority reach the wrong conclusion with regard to her due process rights, but the opinion has the potential to chill important discussions regarding personnel matters among responsible supervisors, discussions that are essential to well-functioning agency administration.
The relevant facts are clear. Ms. Graviss was employed as a preschool teacher for special-needs children in a school operated under the Department of Defense. Her immediate supervisor was Dr. Andrea McClain, principal of the school. The school and its principal were under the immediate supervision of John Curkendall, Community Superintendent. In turn, Mr. Curkendall reported to Dr. Frank Calvano, District Superintendent. That was the agency chain of command at the time of the events that led to Ms. Graviss’ removal.
From the viewpoint of the agency, Ms. Graviss had not performed well. She had been disciplined previously in a formal letter of reprimand from Dr. McClain for “inappropriate interaction with a student” and “failure to follow directives.” J.A. 691. That interaction apparently involved physical restraint of a misbehaving student in a manner contrary to the school’s .standing instructions.
*1371 The particular event that precipitated Ms. Graviss’ removal involved her again having physically handled a child. The event was witnessed by two classroom aides who were sufficiently concerned that they reported the event to Principal McClain. After' an investigation,' Dr. McClain forwarded a Serious Incident Report to Mr. Curkendall, her immediate supervisor, and Dr. Calvano, at the next supervisory level. Dr. Calvano obviously was aware of the problem with the teacher’s physical handling of children, as he responded to that report with an email, to both Mr, Curkendall and Dr. McClain. In that email, the District Superintendent said that “we need to try and terminate her for. repeated use of corporeal punishment and for insubordination.” J.A. 680. That email is the subject of this appeal.
The following month, Dr. McClain issued a notice of proposed removal based on “inappropriate physical contact with a student,” the event arising from that particular incident. J.A. 708. The notice did not include either of the concerns that Dr. Calvano identified, corporal punishment or insubordination.
The Community Superintendent, Mr. Curkendall, subsequently was designated the deciding official in the case, pursuant to the agency’s procedures. In due course, after hearing and consideration of Ms. Graviss’ responses to the charge, he issued a formal decision removing her.
During her appeal from the agency’s decision of removal, which she elected to take to an arbitrator rather than the Merit Systems Protection Board (“MSPB”), the existence of the Calvano email was disclosed. The arbitrator upheld the removal by the agency, and appeal was taken here.[1]
The issue presented is, does the existence of that[1] email sufficiently taint the agency’s removal process so as to deprive Ms. Graviss of the constitutional due process under the Fifth Amendment to which she is entitled?
1. Loudermill •
The Supreme Court in 1985 set out the basic parameters of proper process for removing employees from public service, at least as far as constitutional due process requires.[2] Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In the combined cases generally known as Loudermill, the employees were summarily dismissed without a hearing. The issue before the Court was what rights, if any, does a public employee have to notice and opportunity to be heard before the decision to remove is made (the pre-decision right), when post-decision procedures are in place. The Court announced that, under the Constitution’s due process clause, “the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer’s evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government’s interest in quickly removing an unsatisfactory employee.” Id. at 546, 105 S.Ct. 1487 (citations omitted).[3] In *1372 LoudermMl, there was no issue of a prior communication among those in the agency chain of command regarding the particular matter. (We refer here to such prior communication as ex parte communication, the general term ex parte simply meaning without the knowledge or involvement of all parties).[4]
2. Stone
The issue of ex parte communication was before this court fourteen years later in Stone v. Federal Deposit Insurance Corp., 179 F.3d 1368 (Fed. Cir. 1999).[5] Mr. Stone was removed from federal employment following a full hearing and opportunity to respond to the charges. However, subsequently, during his appeal of the agency decision to the MSPB, Mr. Stone learned that a previously undisclosed memo on the matter from the official recommending Stone’s removal had been sent to the deciding official, and that a second such memo had been sent to the deciding official by another agency official urging Mr. Stone’s removal. The MSPB nevertheless affirmed the removal, and he appealed here.
The majority in the case now before us turned to Stone for its analysis of the applicable law. In Stone, this court said that “not every ex parte communication is a procedural defect so substantial and so likely to cause prejudice” that it constitutes a due process violation. Id. at 1376-77. “Only ex parte communications that introduce new and material information to the deciding official will violate the due process guarantee of notice. In deciding whether new and material information has been introduced by means of ex parte contacts, the Board should consider the facts and circumstances of each particular case.” Id. at 1377. The court then laid out several factors to be considered: “whether the ex parte communication merely introduces ‘cumulative’ information or new information; whether the employee knew of the error and had a chance to respond to it; and whether the ex parte communication were of the type likely to result in undue pressure upon the deciding official to rule in a particular manner.” Id.
The Stone court declined to express any opinion about whether the ex parte communications in that case constituted new and material information; indeed, the court’s opinion does not elaborate on exactly what was said in either of the communications involved. The matter was returned to the MSPB for further consideration pursuant to the court’s newly-articulated criteria. (On remand, the MSPB disposed of the case by a single word, “Dismissed.” 84 M.S.P.R. 623 (Oct. 15, 1999)).
a. The first Stone factor
The majority here finds the email from Dr. Calvano constitutes a communication of new and material information in violation of the first Stone factor. I disagree. First, the mere fact of a prior communication, that is, some earlier communication from an official in the chain of command to the eventual deciding official regarding the existence of a personnel problem, cannot constitute by itself the proscribed ex parte communication. If it did, the rule would be simply that any communication by a supervisory officer regarding an existing personnel issue to a lower administrative officer who then becomes the deciding official in the particular case violates due process.
*1373 This would mean that in any well-functioning administrative agency, in which lower administrative officers regularly confer with and seek the advice of their responsible superiors, especially about personnel problems, no subsequent process within the administrative chain of command regarding such matters could be conducted. Every disciplinary case would have to be referred to an outside entity for initial review and decision.[6] That is contrary to good administrative practice, and certainly not the process that Congress and the agencies have in place. As a general proposition, courts regularly require that employees exhaust their administrative remedies before they can seek relief in the courts.
What the first Stone factor addresses, when it invokes the concept of a relevant ex parte communication, is a communication that contains new and material information about the fads and circumstances of the event at issue. And even then, as the Stone court notes, a comment on the facts may not be relevant if it is just “cumulative” information. In the case before us, Dr. Calvano’s email did not contain any new information whatsoever about the specifics of the incident described in the Serious Incident Report, on which the charges against Ms. Graviss were based
It could be argued that the email did provide Mr. Curkendall new information— that is, the fact that Dr. Calvano, his superior, was concerned about this employee and wanted something done. Given the content of the email, however, it seems unlikely that this was the first inkling that Mr. Curkendall had regarding his supervisor’s concerns; Dr. Calvano obviously had been advised previously that Ms. Graviss’ behavior with the children was viewed as a problem by the school principal.
In any event, even if the fact of Dr. Calvano’s concerns were new information, they did not prove to be material, as I shall explain in the discussion of Stone factor three, below. Accordingly, the circumstances of this case do not disclose a relevant ex parte communication containing new and material information.
b. The second Stone factor
Even if it could be argued that the email from Dr. Calvano constituted new and material information, the second Stone factor asks whether the employee knew of the communication and had a chance to respond to it. There is no argument that the existence of the Calvano email was not disclosed to the employee at the time she had her hearing before the administrative deciding official; the existence of the email came out during the appeal proceedings before the arbitrator. At that point, the arbitrator gave Ms. Graviss full opportunity to respond to the implications of that communication; it became a major issue in the record before the arbitrator.
In terms of due process, it is important that the employee be given a full and fair hearing at which an ex parte communication such as this is considered and evaluated. In this case, that full and fair hearing was held before the arbitrator, the review route chosen by Ms. Graviss. The record before the arbitrator reveals a full discussion and consideration of the email’s existence and possible consequences. Ultimately the arbitrator found that the email did not affect the propriety of the administrar tion’s removal decision.
*1374 In Loudermill, the Supreme Court made special note of the state’s -statutory mechanisms for review of administrative personnel decisions. The existence of such review mechanisms was part of the Court’s explanation for why it established a fairly basic notice and hearing requirement in order'to comply with due process. Loudermill, 470 U.S. at 546, 105 S.Ct. 1487 (noting that the Court’s decision “rests in part on the provision in Ohio law for a full post-termination hearing”); see also Id. at 542 n.7, 105 S.Ct. 1487 (noting that “[tjhere are, of course, some situations in which a post-deprivation hearing will satisfy due process requirements”).
In this case, the hearing before the arbitrator, though it occurred post-deprivation, provided the employee with a full opportunity before a disinterested decision-maker to explore the existence and ramifications of the now-disclosed ex parte communication, including opportunity to confront the key witness, the administrator who made the decision to remove her. Undoubtedly, it would have been preferable had the issue been fully aired at the initial stages of the administrative review, for whatever relevance to the merits it may have had. But it would not be appropriate for us in this case to impose a higher due process standard than that called for by the Loud-ermill ruling, thus creating an indeterminate higher standard that would have the potential for chilling the communication needed among responsible administrative officers.[7]
c. The third Stone factor
Finally, the third Stone factor asks whether the ex parte communication was of the type likely to result in undue pressure upon the deciding official to rule in a particular manner. That question is one of fact—whether this particular communication is the type likely to result in undue pressure upon the deciding official in this case. Each case will be different—different content to the communication, different source from which the communication emanated, different recipient of the communication, and different defendant’s conduct. That is why, as the Stone court put it, the outcome turns on “the facts and circumstances of each particular case.” 179 F.3d at 1877.
In this case, the arbitrator heard the witnesses, including the agency’s deciding official. The question of whether Mr. Curk-endall, the deciding official, was pressured at all, much less unduly pressured, was explored at length. He denied feeling any pressure to decide the case one way or the other, explaining that he understood and felt free to make the decision regarding removal based on the facts before him. The arbitrator, after hearing the testimony of the witnesses, concluded that the deciding official acted according to his best judgment on the facts before him, and without regard to the earlier ex parte communication.
*1375 That factual conclusion is reviewed by us under the deferential standard prescribed by statute—is there substantial evidence in the record supporting it? While there are many cases that delve into the meaning of “substantial evidence,” sometimes with different terminology, they all come down to this—it is not whether a reviewing judge would have' so concluded, rather it is whether the evidence is such that a reasonable person could have arrived at this conclusion.[8] An even more deferential standard applies to the fact-finder’s determinations about the credibility of the witnesses.[9]
In this case, the facts in the record establish that a senior administrator was concerned about a new incident involving this teacher, to the point of expressing that concern, and before any formal charges were brought. The actual charges brought did not reflect the concerned administrator’s particular views of what charges could be brought. The deciding official testified that he had not been directed by the particular views of his superior in the case, and provided examples of occasions when he disagreed with such suggestions, in the past.
The deciding official convinced the arbitrator that he did not feel any pressure regarding how to decide the case, one way or the other. This conclusion must be understood in the context of administrative agency processes. In Loudermill, the Court commented that “the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions— essentially," a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.” Loudermill, 470 U.S. at 545-46, 105 S.Ct. 1487.
This recognizes that, by virtue of their position as part of the agency, administrative officers when hearing a case such as this are not expected to be in the same position of impartiality as a judge or other independent decision-maker. Compare Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) (“The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.”), with Walker v. City of Berkeley, 951 F.2d 182, 183-84 (9th Cir. 1991) (holding that pre-deprivation due process under Loudermill does not require “an impartial decision-maker at the pretermination stage ... so long as the decisionmaker at the post-termination hearing is impartial”).
An understanding of the administrative context reflected in the record before us, coupled with the arbitrator’s personal assessment of the veracity of the witnesses, makes the arbitrator’s factual conclusions unassailable under our standard of review. The majority's effort to transpose this factual conclusion into something else, something subject to the unlimited discretion of reviewing judges, is, in my view, inconsistent with controlling law.
3.
As the Stone court stated, “[ujltimately, the inquiry ... is whether the ex parte communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances.” 179 F.3d at 1377. That is far from this case.
For áll these reasons, the arbitrator’s decision should be affirmed. I respectfully *1376 dissent from the contrary decision reached by my colleagues in the majority.

. It is an open question whether Ms. Graviss’ union is a proper petitioner in this case; however, as that question was not raised by the Government, it need not be addressed here.

. It is of course possible for statutes and regulations, as well as employment contract provisions, to impose more process than what is due under the Constitution.

.Since Loudermill involved state employees, the due process clause was that of the. 14th Amendment; no one doubts that federal employees such as Ms. Graviss have at least the same basic rights under the due process clause of the 5th Amendment.

. See, e.g., ex parte, Black’s Law Dictionary (10th ed. 2014).

. This court also addressed the issue in other cases post-Loudermill. See, e.g., DeSarno v. Dep't of Commerce, 761 F.2d 657 (Fed. Cir. 1985).

. The Administrative Procedure Act ("APA”) prohibits ex parte communications, but not between agency employees such as Dr. Calvano and Mr. Curkendall. See S. Rep. No. 354, 94th Cong., 1st Sess. 36 (1975); H.R. Rep. No. 880, 94th Cong., 2d Sess. 20 (1976) (“Communication solely between agency employees are excluded from the section's prohibition.").

. See also the concurring position of our sister circuits. See, e.g., Senra v. Town of Smithfield, 715 F.3d 34, 39-40 (1st Cir. 2013); Coollick v. Hughes, 699 F.3d 211, 220-21 (2d Cir. 2012); McDaniels v. Flick, 59 F.3d 446, 456-60 (3d Cir. 1995); Dennison v. County of Frederick, Va., 921 F.2d 50, 55 (4th Cir. 1990); Caine v. Hardy, 943 F.2d 1406, 1412 (5th Cir. 1991); Kuhn v. Washtenaw County, 709 F.3d 612, 621-23 (6th Cir. 2013); Schacht v. Wisconsin Dep't of Corrections, 175 F.3d 497, 503 (7th Cir. 1999), receded from on other grounds in Higgins v. Miss., 217 F.3d 951 (7th Cir. 2000); Krentz v. Robertson Fire Prot. Dist., 228 F.3d 897, 902 (8th Cir. 2000); Association for L.A. Deputy Sheriffs v. County of L.A., 648 F.3d 986, 991-92 (9th Cir. 2011); Saavedra v. City of Albuquerque, 73 F.3d 1525, 1533 (10th Cir. 1996); McKinney v. Pate, 20 F.3d 1550, 1556-57 (11th Cir. 1994); Wash. Teachers’ Union Local No. 6, Am. Fed’n of Teachers, AFL-CIO v. Bd. of Educ. of the Dist. of Columbia, 109 F.3d 774, 781 (D.C. Cir. 1997).

. See, e.g., Parker v. United States Postal Serv., 819 F.2d 1113, 1115 (Fed, Cir. 1987).

. See, e.g., Hambsch v. Dep’t of the Treasury, 796 F.2d 430, 436 (Fed. Cir. 1986).